**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Bruno's Supermarkets, LLC, | ) | |
| dba Food World | ) | |
| dba Food Max | ) | Case No. 09-00634-BGC-11 |
| | ) | |
| Debtor. | ) | |

**Memorandum Opinion**

The matters before the Court are: (1) the <u>Debtor's Motion to Reject Collective Bargaining Agreements Pursuant to Section 1113</u>, filed March 9, 2009, Docket No. 356; and (2) the <u>Objection of United Food and Commercial Workers Union Local 1657 to Debtor's Motion to Reject Collective Bargaining Agreements Pursuant to Section 1113</u>, filed March 23, 2009, Docket No. 469.[1]

A trial was held on April 2, 2009. Bruno's was represented by Robert B. Rubin, Dent M. Morton, K. Bryance Metheny, Marc P. Solomon, and Ronald W. Flowers of Burr & Forman LLP. The Union was represented by Thomas N. Ciantra and Oriana Vigliotti of Cohen, Weiss & Simon LLP and by Glen M. Connor of Whatley, Drake & Kallas, LLC. Also appearing were: Rufus T. Dorsey, IV of Parker, Hudson, Rainer & Dobbs LLP, attorney for Regions Bank; and, James Sacca and John Elrod of Greenberg Traurig, LLP, attorneys for the Unsecured Creditors Committee.

## I. Background

Bruno's began as a family-owned grocery business in 1933.[2] It remained family-owned until 1995 when it was acquired by Kohlberg Kravis Roberts & Co. (KKR), a private equity firm based in New York, New York. After filing its first Chapter 11 bankruptcy in Delaware in 1998, Bruno's was bought from KKR in 2001 by Ahold USA, Inc, the United States subsidiary of Koninklijke Ahold N.V., an international supermarket conglomerate based in the Netherlands. Ahold sold Bruno's in 2005 to Lone Star Fund V (U.S.), L.P. ("Lone Star Five"), a private equity firm based in Dallas, Texas.

---

[1] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to these matters by Federal Rules of Bankruptcy Procedure, Rules 7052 and 9014.

[2] Bruno's corporate history is well documented in the parties' pleadings. It is not necessary to repeat it all here.

Bruno's operated over 150 stores under several brand names after it emerged from its first Chapter 11 bankruptcy in 2000, but in 2005 Lone Star sold about 100 stores to C & S Grocery, a creditor in the instant case. Lone Star was operating 66 or 67 stores in Alabama and the Florida Panhandle under several brand names when the current case was filed. Since filing this case, Bruno's closed ten stores.

Bruno's and the United Food & Commercial Workers Union Local 1657 have had a relationship since the family-owned days. That relationship continued with the company's three purchasers.[3]

Bruno's and the Union have four current collective bargaining agreements (CBAs) covering employees in various stores. Two were entered on July 30, 2005, and both expire on July 25, 2009. Union Exs. 1A & 1B. The third was entered on May 25, 2005, and expires on October 23, 2010. Union Ex. 1C. The fourth was entered on February 19, 2005, and also expires on October 23, 2010. Union Ex. 1D.

Each of these CBAs has what is commonly referred to as a "successorship clause."[4] A successorship clause makes the CBA binding on a "successor" employer, that is, a later purchaser. All of Bruno's CBAs with the three non-family owners have included these successorship clauses.

The successorship clause in each of the four current CBAs reads in part:

In the event that any or part of the assets of the employer are sold to a purchaser as a going concern, <u>the Employer shall require the purchaser as a condition of the sale to recognize the Union, and assume all obligations of the Employer under this Collective Bargaining Agreement</u> as of the sale closing date.

Union Exs. 1A, 1B, 1C, & 1D (emphasis added).[5] These provisions are common in collective bargaining agreements.[6]

---

[3] Bruno's history with the Union is also well documented in the parties' pleadings. Again, it is not necessary to repeat it all here.

[4] The clause is prominent in each agreement as it is the first substantive paragraph following a brief introductory paragraph.

[5] Bruno's is the "employer" in these clauses.

[6] See In re Horizon Natural Resources Co., 316 B.R. 268 (Bankr. E.D. Ky. 2004) which includes, "Each of the collective bargaining agreements includes a 'successorship clause,' whereby the employer agreed not to sell its operation without obtaining the agreement of the purchaser to assume the employer's obligations under the agreement." Id. at 271. Horizon was decided under section 1114, but the same principles apply.

2

Bruno's filed the current Chapter 11 bankruptcy on February 5, 2009. Docket No. 1. While the parties may not agree on what Bruno's intended for its business when it filed this case, they agree that at the time the pending motion was filed, and at all times after, a sale of all, or a substantial part of, Bruno's stores as an ongoing business is all that will save the company from liquidation.[7] What each party believes is necessary for that sale to occur is discussed immediately below.

## II. The Parties' Positions

Bruno's position is that no one will purchase all, or a substantial part of, its stores for an ongoing business so long as a sale is conditioned on accepting the CBAs with the successorship clauses. Bruno's argues that not only will no one purchase the stores with an attached Union contract containing a successorship clause, but also that a CBA with a successorship clause would, "absolutely prevent a sale, lead to liquidation, and ultimately result in nearly 4000 lost jobs." Debtor's Motion to Reject Collective Bargaining Agreements Pursuant to Section 1113 at 17, Docket No. 365.[8]

Bruno's contends that the evidence is "uncontroverted" that potential purchasers, "will not purchase with the CBAs in place." Id. at 18. Bruno's concludes, "Removal of the successorship clause is not only necessary, but critical, to facilitate the sales process." Id. at 27 (footnote omitted).

In its Pre-Trial Summary Statement Bruno's emphasized, "Because if this Motion is not granted, sale will not occur and Bruno's will liquidate, it is necessary that the motion be granted." Id. at 2, Docket No. 574.

Bruno's reiterated its position in its Reply in Support of Its Motion to Reject Collective Bargaining Agreement Pursuant to Section 1113 that, "removal of the successorship clause... is essential for sale...." Id. at 15 (emphasis in original), Docket No. 578. Similarly, it contended "if the successorship clauses are not removed, the union members will definitely lose their jobs." Id. at 22 (emphasis in original).

Bruno's summarized its position in its Post-Hearing Brief which includes:

Whether there is a future for Bruno's stores as going concerns rests on the Court's determination of Bruno's § 1113 Motion. If the Motion is granted, a substantial number of stores will likely be sold, employees at

---

[7] Bruno's is conducting an auction of its assets on April 29, 2009. All or a substantial part of their stores will be sold as an ongoing business, or the property will be purchased for later liquidation at a going-out-of-business sale.

[8] When this case was filed Bruno's employed about 4200 people in the 66 or 67 stores and corporate offices it operated at that time.

3

those stores will have the opportunity to retain their jobs, the lessors will retain tenants, and unsecured creditor recovery will be increased. <u>If the Motion is denied, liquidation will occur soon after. All Bruno's employees will lose their jobs. The unsecured creditors' recovery will be reduced. The lessors will lose their tenants.</u> Through its good faith negotiations, Bruno's has repeatedly expressed to the UFCW the need for successorship clause removal. Yet the UFCW has, without good cause, refused to remove the clause.  Because Bruno's has established all nine requirements for § 1113 relief, the Court should grant Bruno's Motion, keep the sales process alive, and provide employees the opportunity to retain their jobs.

<u>Id</u>. at 1 (emphasis added), Docket No. 610.

The Union's initial position was that it opposed any modification of the successorship clauses.  <u>Objection of United Food and Commercial Workers Union Local 1657 to Debtor's Motion to Reject Collective Bargaining Agreements Pursuant to Section 1113</u>, Docket No. 469.  Since March 13, 2009, its position has been that while it rejects Bruno's proposal to eliminate the successorship clause, it offers for the current successorship clauses to be modified to relieve a buyer from assuming the current CBAs, if the buyer agrees to negotiate with the Union to reach a new agreement with a successorship clause. R. 9:31.[9]

The Union summarized its position in its <u>Pretrial Summary Statement of UFCW Local 1657</u> which includes:

the relief sought is premature and thus not necessary to the Debtor's reorganization under the appropriate standard inasmuch as a potential purchaser may appear and, consistent with the sale schedule, negotiate an acceptable agreement with the Union. Finally, a consensual labor agreement is necessary to preserve the value of the estate's assets which would be undermined by the threat of a strike should the agreements be rejected. A union's right to strike after a bankruptcy court approves rejection of a collective bargaining agreement is clear, and here the Union reserves its rights to do so absent an acceptable negotiated agreement with a purchaser or purchasers.

---

[9]  The official record from this hearing has not been transcribed.  Record numbers indicate the times of day on the official digital court recording.  All record numbers refer to the trial times for April 2, 2009.

4

<u>Pre-Trial Summary Statement of UFCW Local 1657</u> at 1-2 (footnotes omitted), Docket No. 569.[10]

# III.  Applicable Law

## A.  Section 1113 of the Bankruptcy Code

Section 1113 of the Bankruptcy Code allows a debtor to reject a collective bargaining agreement under certain conditions.[11]  Courts agree that there are nine

---

[10] The relationship of organized labor to bankrupt debtors in a section 1113 context has been discussed and analyzed by many courts.  It is not necessary to repeat it here. See <u>In re Alabama Symphony Ass'n</u>, 155 B.R. 556, 566-68 (Bankr. N.D. Ala. 1993), aff'd in part, rev'd in part on other grounds, 211 B.R. 65 (N.D. Ala. 1996) for an excellent discussion of that history.

[11] The pertinent parts of section 1113 read:

(a)  The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)  (1)  Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall--

(A)  make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B)  provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2)  During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

5

elements that must be satisfied to meet those section 1113 conditions.[12]

## B. The Nine Elements

The nine elements a debtor must satisfy before it may reject a CBA are:

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

---

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that--

   (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

   (2) the authorized representative of the employees has refused to accept such proposal without good cause; and

   (3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113.

[12] In re Alabama Symphony Ass'n, 155 B.R. 556, 571 n.32 (Bankr. N.D. Ala. 1993), aff'd in part, rev'd in part on other grounds, 211 B.R. 65 (N.D. Ala. 1996). See also In re Mesaba Aviation, Inc., 341 B.R. 693, 704 n.5 (Bankr. D.Minn. 2006), rev'd in part on other grounds, Association of Flight Attendants-CWA, AFL-CIO v. Mesaba Aviation, Inc., 350 B.R. 435 (D. Minn. 2006) and the cases cited there.

6

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

In re American Provision Co., 44 B.R. 907, 909 (Bankr. D.Minn.1984).[13]

## C. Burden of Proof

Bruno's bears the burden of proving all of these nine elements by a preponderance of the evidence.[14]  If it does not, this Court may not allow it to reject its collective bargaining agreements.

The preponderance of the evidence standard is not the most strict, but it is not the weakest either.  Circuit Judge Gerald Bard Tjoflat of the Court of Appeals for the Eleventh Circuit described it in United States v. Askew, 193 F.3d 1181 (11th Cir.1999), as, "not a high standard of proof... [but not]... a toothless standard either...." Id.

In legal terms, it is, as the court in In re Cady, 195 B.R. 960 (Bankr. S.D. Ga. 1996) defined it:

" 'the evidence which, when weighed with that opposed to it as more convincing force and is more probably true and accurate. If upon any issue in the case, the evidence appears to be equally balanced, or if it cannot be said upon which side it weighs heavier, then plaintiff has not met his or her burden.' " Dahlgren & Co., Inc. v. Lacina (In re Lacina), 162 B.R. 267, 272 n. 6 (Bankr.D.N.D.1993) (quoting Smith v. United States, 726 F.2d 428, 430 (8th Cir.1984)).

---

[13] These elements are almost universally accepted as those that must be satisfied before a CBA may be rejected in a bankruptcy case.  See In re Family Snacks, Inc., 257 B.R. 884, 892 (8th Cir. BAP 2001) which includes, "courts differ in their application and interpretation of § 1113. They do, however, seem to agree that an application to reject a CBA under § 1113 is judged against a nine factor test first articulated in In re American Provision Co., 44 B.R. 907, 909 (Bankr.D.Minn.1984)."  The court in Family Snacks added, "In order to reject a CBA a debtor must prove that it has met each of the nine American Provision factors."  Id. at 898.

[14] Courts agree that the debtor's burden of proof on all nine elements is by a preponderance of the evidence.  See In re American Provision Co., 44 B.R. 907, 909 (Bankr. D. Minn.1984) and the cases cited for that proposition.  But see note 27 below.

7

Id. at 964.[15]

In mathematical terms, it is a standard that is something greater than 50 percent, that is, it is, "more likely than not."  Bell v. U.S., 854 F.2d 881, 891 (6th Cir. 1988).

## IV.  Issue

The general issue is: Did Bruno's prove all nine elements by a preponderance of the evidence?  The dispositive issue is: Did the Union have good cause to refuse Bruno's proposal to remove the successorship clauses from the four current collective bargaining agreements?

## V.  Additional Findings of Fact

The core dispute between Bruno's and the Union is whether anyone will purchase Bruno's assets as a going business if that purchase includes the successorship clauses in the parties' four current collective bargaining agreements.

Bruno's contends that no one will unless those clauses are removed or the CBAs are rejected outright.  Bruno's argues that if neither occurs, no one will purchase the property as an ongoing business.[16]

The Union disagrees but does not insist that a buyer assume the current contracts.  As an alternative, it offers that a buyer agree to negotiate with the Union and enter into a new agreement with a new successorship clause.

### A.  Bruno's Witnesses

Three witnesses testified for Bruno's.  They were: Mr. James Grady, Bruno's Chief Restructuring Officer; Mr. Dennis Wade, Bruno's Vice-President for Human Resources; and Mr. Robert Smith, a member of Bruno's investment banker team.

_____

[15] See also, In re Mathews, 360 B.R. 732, 742 (Bankr. M.D. Fla. 2007) which includes, "A preponderance of the evidence is 'the greater weight of evidence, such that when weighed with that opposed to it, the evidence supplied has more convincing force and is more probably true and accurate.' Whitaker v. J R Produce Corp. (In re Gulf N. Transp., Inc.), 340 B.R. 111, 120 (Bankr. M.D. Fla.2006) (quoting In re Suncoast Towers E. Assocs., 241 B.R. 476, 480 (Bankr. S.D. Fla.1999) (citation omitted))."

[16] Bruno's represented on a number of occasions that even if the contract is rejected, it will honor all of the provisions of the CBAs except the successorship clauses.

8

### 1.  Mr. James Grady

Mr. James Grady is a Senior Director of Alvarez & Marsal North America, LLC. He has been Bruno's Chief Restructuring Officer since January 27, 2009.  He testified that before he arrived, Bruno's lost between $3,000,000 and $5,000,000 per month.  R. 9:54.  After he became the chief restructuring officer, Bruno's lost about $2,000,000 per month. R. 9:54.

Mr. Grady explained that Bruno's post-bankruptcy financing will expire on May 31, 2009.  He does not expect additional financing. R. 9:55.  In addition, he expects Bruno's workers' compensation insurance to expire at the same time.  R. 9:56. At an earlier hearing, the parties agreed that Bruno's may not operate without workers' compensation insurance.[17]

Mr. Grady testified that there is no reasonable prospect that Bruno's will get financing beyond May 31, 2009, and to survive, the business must be sold as a going concern.  R. 9:57.  Such a sale would require the sale of all or a substantial part of Bruno's stores. R. 9:57.  In Mr. Grady's opinion, such a sale would maximize the value of the assets and would benefit others, such as Bruno's employees and the landlords who hold leases for some of Bruno's stores. R. 9:58.

In Mr. Grady's opinion, the only other option is liquidation. R. 9:59.  Mr. Grady did not believe that a buyer would purchase all, or a substantial part, of the stores at liquidation and operate them as a going business.  R. 10:01.  He based that conclusion on the failure of anyone to buy any of the ten stores closed since the bankruptcy was filed.  R. 10:01.

Both parties have made good faith attempts to resolve their differences.  The parties met at least four times.  R. 10:11.  In addition, they have exchanged and discussed various proposals.  Debtor's Exs. 5-10; 12-18, Union Exs. 2-7.

Representatives of both sides have also met with potential buyers.  Mr. Grady testified about the meetings he attended with some of those buyers.  He reported that none of them expressed an intent to assume the parties' current collective bargaining agreements. R. 10:03-04.  Based on those meetings, his opinion is that the successorship clauses were impediments to a sale. R. 10:05.  On direct examination, Mr. Grady was asked, "Has there been any entity with whom you have been personally involved who has indicated that it is willing to assume the collective bargaining agreements with this clause in each of them?" R. 10:05.  He answered, "No." R. 10:05.

---

[17] After Mr. Grady's testimony, Bruno's and its workers' compensation insurer reached an agreement to extend the workers' compensation insurance to June 30, 2009.  The Court approved that agreement.  Docket No. 667.

9

On redirect, Mr. Grady was asked, "Does the company have any offers now that don't involve rejection of successorship clauses?" R. 10:30. He answered, "No." R. 10:30.

Mr Grady did, however, explain what "offers" Bruno's had received and the relationships of those "offers" to the successorship clause issue. He testified that Bruno's had received two "letters of intent" from potential buyers. R. 10:23. Those letters were admitted as Debtor's Exhibits 19 and 20. Exhibit 19 is a letter dated March 10, 2009, submitted on behalf of Associated Wholesale Grocers, Inc. to National City Investments, Inc., Bruno's agent assisting in identifying potential buyers. That letter is captioned, "Preliminary Non-Binding Letter of Interest" and refers to purchasing some of Bruno's stores.[18] The part of the letter regarding the successorship clause issue is paragraph 6(d). The relevant part of that paragraph reads:

> As to each Store, it shall be <u>a condition precedent to the acquisition</u> of the Sale Assets relating to such Store that Buyer (and/or its Retail Operator) <u>enter into a new collective bargaining agreement</u> with the UFCW or other arrangement on acceptable terms (which may differ by Store) which condition must be satisfied or waived as to each such Store....

Debtor's Ex. 19 at 4 (emphasis added). Clearly, that offer did not make elimination of the successorship clauses from the current CBAs a condition of a sale, as Bruno's argues all potential buyers have insisted or will insist. In contrast, the offer made negotiation of, "a new collective bargaining agreement" with the Union one of the conditions to a sale. That is precisely the Union's current position. Unfortunately, the March 10, 2009, "offer" was withdrawn on March 30, 2009. Debtor's Ex. 21 at 1-2; R. 11:21.

Debtor's Exhibit 20 represents a second offer. It is a letter dated March 25, 2009, from Acon Funds Management, LLC to National City Capital Markets. The letter refers to Acon's interest in purchasing some of Bruno's stores. The part of the letter regarding the successorship clause is paragraph 4. The relevant part of that paragraph reads, "<u>Our offer is contingent on the court rejecting the existing Collective Bargaining Agreements</u> covering the stores to be acquired." Debtor's Ex. 20 at 2 (emphasis added).

That offer appears to support Bruno's position; however, as it turned out, that was not Acon's final position. Andre Bhatia, a representative of the potential buyer and the signatory on the original offer, sent Michael Gorman of National City, an email on March 30, 2009, which reads in part, "I want to alert you that <u>we may be willing to accept a renegotiated union contract</u> if that makes our offer more attractive. We would

---

[18] Mr. Grady testified that the letter had not been signed when Bruno's received it, and it had not been signed since. R. 10:31. He did testify "it was an offer" and it was "in-hand." R. 10:31.

be willing to meet with the Union to explore this possibility. Please keep this in mind as you consider our bid." Union Ex. 12 at 1 (emphasis added). Again, that is precisely the Union's current position, and the one it contends establishes its "good cause" for refusing Bruno's proposal.

Consequently, of the two offers Bruno's had at the time, both were willing to accept the now Union position that neither would be required to assume the current CBAs, but that they would negotiate with the Union later to reach a CBA. That was the Union's position when it refused Bruno's final proposal that the successorship clauses must be eliminated.

On cross examination Mr. Grady recognized the Union's changed position. R. 10:19. He testified:

Mr. Ciantra: I want to ask you a couple of questions with respect to the Union's position on the successorship issue. The Company filed this motion on the 9th of March, isn't that right?

Mr. Grady: Yes.

Mr. Ciantra: And you met in Birmingham with other representatives of the Company with the Union on the 13th of March, correct?

Mr. Grady: Yes.

Mr. Ciantra: In Mr. Connor's office?

Mr. Grady: Yes.

Mr. Ciantra: And at that meeting the Union proposed a modification in the successorship language in the contract did it not?

Mr. Grady: The Union proposed a modification of the successorship language?

Mr. Ciantra: Yes.

Mr. Grady: Uh, yes I believe so.

Mr. Ciantra: Right. And the basic outlines of that proposal was the Union uh, the present successorship language requires that in a going concern sale the purchaser agree to assume and be bound by the existing contract. Is that your understanding?

Mr. Grady: That is my understanding.

11

Mr. Ciantra: And the Union proposed that that be changed to only require that the purchaser in a going concern sale agree to an agreement with the Union. Isn't that right?

Mr. Grady: That the Union propose that the Company agree to an agreement, not necessarily the current agreement.

Mr. Ciantra: Right. So the Union had moved off the position of the contract that the buyer take the existing contracts and just negotiate an acceptable agreement between it and the Union. correct?

Mr. Grady: Yes.

Mr. Ciantra: The Union hasn't backslid on that position to your knowledge has it Mr. Grady?

Mr. Grady: Not to my knowledge.

Mr. Ciantra: And the, it's correct that the Company rejected that offer that day?

Mr. Grady: I don't know if it was that day, it may have been the following Monday?

Mr. Ciantra: Pretty soon thereafter?

Mr. Grady: Yes.

R. 10:19-10:21. Unofficial Transcript.

Explaining Bruno's general circumstances, Mr. Grady testified that Bruno's does not have the time to reorganize in the classical sense. R. 10:10. Its intent was to market the stores and sell them as an ongoing business. R. 10:10. If that could not be done, in all likelihood, the stores would be liquidated. R. 10:06.

Mr. Grady concluded that a sale of stores as an ongoing business was what was needed for Bruno's to reorganize, and that the successorship language in the company's four CBAs was preventing that sale. R. 10:14-15.

### 2. Mr. Dennis Wade

Mr. Dennis Wade is Bruno's Vice-President for Human Resources and has been for about a year and a half.

Mr. Wade identified the number of employees and stores that were covered by the four current CBAs. Bruno's has about 4200 employees. Twenty-six hundred, or

12

about 62 percent, are covered by the four current CBA's.  The majority of nonunion employees are part-time employees.  R. 10:46.

Mr. Wade testified that the four current CBAs covered 66 of the 67 stores operating at the time this case was filed.  One store in Florida was not covered.  R. 10:38.  He explained that about 55 of those 66 stores are covered by either the CBAs identified in Union Exhibits 1A or 1B.  Mr. Wade testified that 80 percent of the workers who are covered by CBAs work in those 55 stores and are covered under those two CBAs.  R. 10:38-10:40.  Both of those CBAs will expire on July 25, 2009.  Union Exs. 1A & 1B.  Mr. Wade explained that after those agreements expire the parties will not be bound by the agreements' terms or be bound to enter into new agreements. R. 10:39.[19]

Mr. Wade participated in some of the meetings Bruno's held with potential buyers.  Like Mr. Grady, Mr. Wade testified that he had not been in any meeting where a potential buyer expressed a willingness to buy the stores and assume the current CBAs.  R. 10:43.

Mr. Wade also participated in meetings with Union representatives.  He explained why Bruno's changed its proposal from one that sought economic concessions to the final one requiring a total dissolution of the successorship clauses.  R. 10:44.  He explained that the request for economic concessions was made first to buy time.  Bruno's changed its position to focus exclusively on the successorship issue.  R. 10:44.

### 3.  Mr. Robert Smith

Mr. Robert Smith is a managing director of the Special Situations Group of National City Capital Markets, the investment bankers hired by Bruno's to assist in selling its stores as a going business.

Mr. Smith was offered as both a fact and an expert witness.  The Union objected to Mr. Smith's expert status in the area of sales of distressed businesses where collective bargaining agreements existed.  Mr. Smith testified that he had been involved in three such situations in addition to his extensive experience as an investment banker dealing with distressed business.  Mr. Smith also had extensive

---

[19] Based on this July 25, 2009, expiration date for the two CBAs that cover about 55 of the 67 operating stores, and 80 percent of the workers covered by CBAs, this Court's ruling on whether the CBAs may be rejected should not have any impact on Bruno's auction scheduled for April 29, 2009.  Anyone trying to decide whether to bid at that auction, or how much to bid, knows that the CBAs that cover the vast majority of the stores and employees will expire in less than 90 days.  Consequently, for those reasons, the current CBAs should not be major factors in the number of bids, or the return, Bruno's receives at its auction.

13

experience working with bankrupt companies, particularly with debtor in possession financing, evaluations, and sales of assets in bankruptcy cases. The Court overruled the Union's objection.[20]

Mr. Smith explained how his company evaluated Bruno's situation. He testified that they considered Bruno's financial data and conditions, along with the general economic environment and limited credit markets, before reaching opinions about Bruno's chances of success and its options. R. 11:00. Mr. Smith agrees with most that Bruno's cannot reorganize in the traditional sense, that is, it cannot emerge from Chapter 11 bankruptcy as an ongoing business. R. 11:02. He testified that Bruno's had two options. One was a sale of all or a part of its assets as an ongoing business. The other was a liquidation in a traditional going-out-of-business sale. His opinion is that a sale will produce the best value. R. 11:03.

Mr. Smith offered his opinions on the difficulties of selling Bruno's stores as an ongoing business. That testimony included:

---

[20] Writing for the Court of Appeals for the Eleventh Circuit in Hamer v. City of Atlanta, 872 F.2d 1521 (11th Cir 1989), Circuit Judge Thomas Alonzo Clark explained:

> The finding of validity by the district court must be examined by this court under a standard of clear error. Ensley Branch of NAACP, 616 F.2d at 818. We must therefore consider whether there was sufficient evidence on which the trial court could base its decision that the examination had been properly validated. Part of this inquiry requires an examination of the weight that is to be given to the opinions of the respective expert witnesses in this case. "... [O]ne of the most generally accepted rules of all jurisprudence, state and federal, civil and criminal, is that the questions of credibility and weight of expert opinion testimony are for the trier of fact...." Mims v. United States, 375 F.2d 135, 140 (5th Cir.1967). "Credibility choices and the resolution of conflicting testimony are for the trial court, if not clearly erroneous." Middleton v. Dan River, Inc., 834 F.2d 903, 910 (11th Cir.1987), citing United States v. Reddoch, 467 F.2d 897, 898 (5th Cir.1972). In Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1513, 84 L.Ed.2d 518, 529-30 (1985), the Supreme Court stated: "When a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."

Id. at 1532.

After ruling on the Union's objection, the Court reserved the right to determine the weight given to Mr. Smith's testimony in the area of CBAs in sales of distressed businesses. The Court reviewed the record on this issue and finds that Mr. Smith was a very credible witness in the areas he was offered, and his testimony should be given weight equal to his expertise.

14

Mr. Morton:    Now when you made the determination that Bruno's needed to be sold, did you foresee any difficulties in selling the stores as going concerns?

Mr. Smith:     Yes I did.

Mr. Morton:    And what were those difficulties?

Mr. Smith:     There are several difficulties.  Again, one, macro economic environment and the credit environment.  Two, the leaseholds. The stores have a wide-range of leaseholds that present potential obstacles that will have to be dealt with.  And three, the successorship clause in the collective bargaining agreement.

Mr. Morton:    And how do you view that successorship clause as creating an obstacle?

Mr. Smith:     There are parties who have expressed to me a concern with stepping into existing collective bargaining agreement and in some cases with stepping into a collective bargaining agreement at all.

Mr. Morton:    And when you say parties, do you mean prospective purchasers?

Mr. Smith:     Prospective buyers.

R. 11:04-11:05.  Unofficial Transcript.

Mr. Smith also testified as a fact witness about his company's efforts to sell Bruno's stores as an ongoing business. R. 11:05.  National City collected extensive information about Bruno's and Bruno's stores.  An abstract was prepared for each store.  A comprehensive database was created for potential buyers to access information such as the collective bargaining agreements and Bruno's current leases. R. 11:05

National City relied on national databases of potential buyers and on internal databases.  It consulted participants in the industry and Bruno's management. Through its efforts, National City identified 110 potential buyers.  It contacted each directly.  Anyone interested was provided a confidentiality agreement.  If that agreement was signed, the potential buyer was allowed access to the database to extract information about Bruno's.  R. 11:06.  Out of this 110, National City identified three buyers that might buy 30 or more stores. R. 11:11.

Mr. Smith agreed with Mr. Grady that Bruno's received two "offers." Those offers are the ones represented by Debtor's Exhibits 19 and 20.  Mr. Smith testified about the CBA issue involved with each.  In regard to Debtor's Exhibit 19, he was

15

asked, "Is there anything in this offer where the offeror agrees to accept the <u>current</u> collective bargaining agreements." He testified, "No." R. 11:16 (emphasis added).[21]

Unrelated to the CBA issue, Mr. Smith recommended that Bruno's not accept the Exhibit 19 offer because value was an issue and the offeror required Bruno's to negotiate with it exclusively. R. 11:18.

Mr. Smith testified about the offer represented by Debtor's Exhibit 20. That offer was for 33 stores, 28 of them were the same stores as the first offer. R. 11:23.

When asked about the successorship clause issue in regard to this second offer, Mr. Smith recognized that this, "offer... [was] contingent on the court rejecting the existing Collective Bargaining Agreements covering the stores to be acquired." Debtor's Ex. 20 at 2; R. 11:24.[22]

Mr. Smith testified about a third potential buyer that both he and the Union recognized as a reasonable prospect. He explained that the Union was meeting with that potential buyer that evening. R. 11:26. No offer had been made at the time of the trial. R. 11:27.

Mr. Smith also testified extensively about the impact of the current CBAs on a sale of Bruno's stores as a going business. He offered several expert opinions. His testimony included:

Mr. Morton:   Was the successorship clause an issue in the negotiations with prospective purchasers that you dealt with?

Mr. Smith:   Yes.

Mr. Morton:   How many of them?

Mr. Smith:   Well, certainly with the three who have stepped forward and indicated an interest in a majority of the stores and in addition, I would say with another five who have indicated an interest in purchasing, if not a majority, a select number of stores in different parts of the footprint.

---

[21] As will be explained below, the difference between a <u>current</u> CBA and a <u>future</u> CBA is important in resolving the pending matters.

[22] In contrast, see Union Ex. 12, a later letter from this potential buyer which reads, "we may be willing to accept a renegotiated union contract if that makes our offer more attractive...." <u>Id</u>.

16

Mr. Morton:   Did any of those prospective purchasers express a willingness to purchase Bruno's stores with current collective bargaining agreements in place?

Mr. Smith:    No.

Mr. Morton:   Based on your experience selling distressed companies during a bankruptcy proceeding, do you have an opinion about whether Bruno's will sell all or substantially all of its stores as going concerns if the successorship clause is not removed from the collective bargaining agreements?

Mr. Smith:    Yes I do.

Mr. Morton:   And what is that opinion?

Mr. Smith:    It's my opinion that Bruno's, you know is clearly, will have a challenge ahead of it to sell all or substantially all of these stores. It will have an even greater challenge if it is forced to sell all or substantially all with the successorship provision in place.

Mr. Morton:   Now we know that the Union is talking to a couple of prospective purchasers or at least interested parties. Do you have an opinion as to whether the collective bargaining agreement will still need to be rejected if the Union reaches an agreement with one of those entities?

Mr. Smith:    Yes I do.

Mr. Morton:   And what is that opinion?

Mr. Smith:    For multiple reasons I think it needs to be rejected. One, as we stand here today, there is no certainty that either one of those parties will ultimately get to the closing table. Number two, well one of the parties has not submitted an offer, the other has, and we received the second offer that we discussed earlier. Those two offers which have already been received, are for a finite number of stores. For, in one case, 39 out of 56. In another, 33 out of 56. If we go to auction it's our hope and out intent to sell as many stores as possible. Which means that should one buyer purchase the majority of the stores, we would hope and we would try to entice additional buyers to purchase the remaining stores. If in fact those two buyers fall off the table, or for some reason come back and reduce the size of the footprint that they are willing to acquire because their negotiations with the landlords are unsuccessful,

17

now I'm not suggesting the second one would even have that requirement - we haven't seen anything, but the two that we have said we've got to renegotiate with the landlord. Which means that in the event those negotiations are not successful, they may not acquire 33 stores, they may acquire 30, 28, we don't know. In order to maximize the interest in the stores in their entirety, it's my opinion that we want to have as many bidders at the table as absolutely possible, for the business in totality or for the business in part. And to do that, we need to reject the collective bargaining agreement.

Mr. Morton:    Do you have an opinion as to whether or not you will have, well let me back up. At some point there will be an auction in connection with Bruno's stores. Correct?

Mr. Smith:    Correct.

Mr. Morton:    Do you have an opinion as to whether or not you will have bidders on those stores at the auction if the collective bargaining agreements are still in place?

Mr. Smith:    I do and I hope I'm right. I have an opinion that we will have bidders at that point in time.

Mr. Morton:    Your opinion is that you will have bidders if the collective bargaining agreements are in place?

Mr. Smith:    Um, yes, but we will have substantially fewer than if the collective bargaining ... I'm going to rephrase that. We have bidders who have indicated for a small number of stores that they would be willing to negotiate with the Union. We have not had bidders who have indicated that they would be willing to assume the collective bargaining agreement. To the extent that it's in place, it will impact, may impact in totality the number of bidders who show up. Um, but, that's not to suggest that none of those bidders is willing to negotiate and willing to participate in the development of a collective bargaining agreement per se.

Mr. Morton:    Alright. But the question is if, as a condition of the sale they are required to assume the collective bargaining agreements, do you believe you will have purchasers?

Mr. Smith:    No.

R. 11:30-11:36 (emphasis added). Unofficial Transcript.

18

If in Mr. Smith's expert opinion there would be bidders at a sale of Bruno's stores even if the CBAs remained active, how many additional bidders would there be if they were aware of the Union's position that a buyer would not be required to assume the <u>current</u> CBAs?[23]

On cross examination Mr. Smith testified that Bruno's had not told the potential buyers about that possibility. He stated:

Mr. Ciantra:    You are aware here that <u>the Union's position in negotiations since the 13th of March has not been that a purchaser must assume the existing agreement</u>. You are aware of that aren't you?

Mr. Smith:    Yes.

Mr. Ciantra:    And you've communicated... <u>Have you communicated that to any parties that you have had discussions with that have been interested in acquiring these stores</u>?

Mr. Smith:    What I have communicated is that, you know, we would insist that as part of any process you meet with the Union and negotiate with the Union. <u>We have not communicated anything regarding the Union's position one way or another</u>.

Mr. Ciantra:    Okay. So, when a prospective purchaser has come and you have had discussions since the 13th of March, <u>it is the case that the Company has not informed them that the Union is not insisting on the assumption of the existing agreements. That's your testimony</u>?

Mr. Smith:    <u>Correct.</u>

Mr. Ciantra:    But you know that's not the Union position and you've known that for weeks. Correct?

Mr. Morton:    Objection, asked and answered.

Judge:    Overruled.

Mr. Smith:    Yes.

R. 11:39-11:40. Unofficial Transcript.

---

[23] Why this matters is discussed later.

19

Again, this Court must ask, if there will be bidders at an auction even if the CBAs are in force, or there will be buyers who are "willing to negotiate and willing to participate in the development of a collective bargaining agreement...," id., how many would there be if the potential buyers knew that the buyer would not be required to assume the underline current CBAs but instead could negotiate a new agreement with the Union?

## B. The Union's Witnesses

Three witnesses testified for the Union. They were: Mr. Michael Glanzer, an advisor to the Union; Ms. Elaise Fox, President of the United Food and Commercial Workers Union Local 1657; and Mr. Alvin Vincent, Jr., International Vice-President and Regional Director of the United Food and Commercial Workers Union.

### 1. Mr. Michael Glanzer

Mr. Michael Glanzer testified as a fact and an expert witness. Bruno's did not object to his expertise.

Mr. Glanzer is a partner in Glanzer & Company LLC, a financial advisory firm and a vehicle for Mr. Glanzer and his partners to invest. His financial advisory work consists chiefly in restructuring work, principally representing union clients. He is assisting the Union in its analysis of Bruno's financial conditions and providing strategic advice in connection with the bankruptcy.

His opinion was that because of Bruno's financial conditions the company was severely challenged. Based on the lender's documentation, it was his opinion that a sale was required. He advised the Union to cooperate as much as possible in seeking buyers for that sale. R. 1:12.

In regard to the core issue between the parties, Mr. Glanzer testified that successorship clauses in CBAs were common and the type in Bruno's four current agreements was, "middle-of-the-road, its not particularly strong one way or the other...." R. 1:13. His expert opinion is that it is not necessary to address the successorship clause issue before a sale. That issue can be discussed later. R. 1:23.[24]

Mr Glanzer explained the typical situation for parties like these is that both have something to gain and both have something to lose. The Union may lose jobs, and the company may not receive the desired purchase price. R. 1:14. The important point is that it is in the interest of both to find a buyer as quickly as possible, with each recognizing that it may not get everything it wants.

---

[24] If Mr. Glanzer is correct, the amount of the bids Bruno's receives at an auction should not be affected by the current CBAs.

20

Like the other witnesses, Mr. Glanzer was involved in a meeting with Bruno's representatives regarding the "third" potential buyer identified by Mr. Smith. He urged Bruno's financial advisors to help get that party to the table. R. 1:21.[25]

On cross examination, Mr. Glanzer agreed that Bruno's needs to be sold. He did not agree that if a sale as a going concern was not possible that liquidation was the only possibility. His opinion is that someone may buy the stores in a liquidation and then operate them as a going business. R. 1:29.

Mr. Glanzer testified that cooperation is key. Everyone has something to gain and everyone has something to lose. R. 1:34.

## 2. Ms. Elaise Fox

Ms. Elaise Fox is the President of the United Food and Commercial Workers Union Local 1657, and a Vice-President of the International United Food and Commercial Workers Union. She has held officer positions in the Local Union for 25 years and has been the President for seven years.

Ms. Fox testified about the historical relationship between Bruno's and the Union. That relationship began in about 1961 while the company was owned by the Bruno family. R. 1:47. She stated that there were no "major issues" during that time. R. 1:47.

Ms. Fox testified that Bruno's relationship with the Union remained stable until KKR purchased the company in 1995. R. 1:48. After the KKR purchase, the Union became concerned about the future of Bruno's employees. The Union did not know if Bruno's would be sold again, and if it were, who would buy it and when. At the time, some of Bruno's employees had worked for the company for 25 years. The Union wanted to assure that the benefits those long-term employees had earned would remain by way of the successorship clause in the then active CBA. Ms. Fox testified that without the successorship protection, current employees might be hired as new employees which would require them to start over by earning lower wages with fewer benefits. The Union believed that the employees would be protected by the successorship clauses in the collective bargaining agreements. R. 1:48-1:49.

After negotiations and a seven-day strike in 1999, the Union and KKR entered into a CBA which included the successorship language. The successorship language in the four current CBAs is the same language as that in the 1999 agreement. R. 1:50.

---

[25] Mr. Glanzer confirmed that this "third" entity was neither of the ones identified in Debtor's Exhibits 19 and 20.

Ahold USA bought Bruno's in 2001.  New CBAs were negotiated in 2002. Those agreements included the successorship clauses.  Lone Star Fund V (U.S.) bought Bruno's in 2005.  The four current CBAs, with the successorship clauses disputed here, were reached in 2005.  Union Exs. 1A, 1B, 1C, and 1D. R. 1:51-1:57.

Lone Star sold numerous stores to C&S Wholesale Grocers who operated them under the name Southern Family Markets.  Ms. Fox testified that C&S purchased those stores with the CBAs in place and that those CBAs included the same successorship language as the current agreements.  R. 1:51-1:57; 2:14.  Therefore all of the CBAs between Bruno's and the Union from 1961 to now have included successorship clauses.

Ms. Fox explained the Union's current position.  She testified that while the Union has not agreed to delete the successorship clauses from the current CBAs, it has agreed to modify the successorship clauses to remove the requirement that a buyer assume the current CBAs in favor of requiring a buyer to negotiate a new agreement. R. 1:57-1:59.

Like the other witnesses, Ms. Fox participated in meetings with both potential buyers and with opposition representatives.  She testified about her meetings with the potential buyers identified in Debtor's Exhibits 19 and 20.  She testified that her meeting with the potential buyer in Exhibit 19 was not productive.  Regarding her meeting with the potential buyer in Exhibit 20, Ms. Fox confirmed what Union Exhibit 12 represented, that is, that this potential buyer was willing to negotiate a new contract with the Union, regardless of the contrary language in its proposal to Bruno's. R. 2:05. That potential buyer asked the Union to consider modifying the language of the successorship clauses, consider consolidating the four CBAs, and consider negotiating a new agreement.  The Union agreed to those terms.  R. 2:07.

### 3.  Mr. Alvin Vincent, Jr.

Mr. Alvin Vincent, Jr. is the International Vice-President and Regional Director of the United Food and Commercial Workers Union.  In those positions he has assisted the Union in its negotiations with Bruno's.  R. 3:03-3:04.

Like other witnesses, Mr. Vincent had meetings with his opposition representatives and with potential buyers.  He attended the first meeting between the Union and Bruno's on February 2, 2009, in Orlando.  The Union was having a regularly scheduled meeting and agreed to meet with Bruno's.

Mr. Vincent testified that at that meeting Bruno's representatives explained Bruno's "dire" financial situation and made about 11 oral proposals to the Union. R. 3:05

22

Mr. Vincent understood after the Orlando meeting that Bruno's was interested in continuing operations. He testified that he learned shortly after Bruno's filed this case that Bruno's intended to sell its stores.

Mr. Vincent also met with representatives of those making the "offers." As identified above, those are the "offers" represented by Debtor's Exhibits 19 and 20. R. 3:13.

Mr. Vincent agreed with Ms. Fox that the discussions with the representative from Exhibit No. 19 were not productive.

Mr. Vincent confirmed Ms. Fox's testimony that the potential buyer identified in Exhibit 20 modified its proposal to eliminate the requirement that current CBAs be rejected. Mr. Vincent testified that the representative asked the Union to consider modifying the language of the successorship clauses, consider consolidating the four CBAs, and consider negotiating a new agreement. Like Ms. Fox, he testified that the Union agreed. He explained that the representative stated that he did not have an interest in the outcome of the section 1113 hearing and wanted to work in partnership with the Union for the long-term stability of the stores. R. 3:15-3:17.

Mr. Vincent agreed with Ms. Fox that while the Union has not agreed to delete the successorship clauses from the current CBAs, it has agreed to modify the successorship clauses to remove the requirement that a buyer assume the current CBAs in favor of requiring a buyer to negotiate with the Union and enter into a new agreement. R. 3:23. On cross examination, he admitted that even if a buyer would not be required to assume the current CBAs, the Union would still insist that whatever agreement was reached that the agreement include a successorship clause. R. 3:27-3:28.

Mr. Vincent agreed with Bruno's that the two "offers" Bruno's received have not evolved into letters of intent, actual offers, or bids. R. 3:28

Mr. Vincent confirmed that there had not been any potential buyer who has committed to buying the stores and assuming the current CBAs. R. 3:28-3:30.3:39.

## VI. Additional Conclusions of Law

As discussed earlier, Bruno's must prove all of the nine elements listed above. If it fails on any one, the Court may not approve its request to reject the collective bargaining agreements. As discussed in detail below, the Court finds that Bruno's did not prove element number eight.[26] Therefore, Bruno's did not prove all nine elements,

---

[26] All of the other elements are as important as element number eight; however, this Court is reminded, "Sound judicial policy counsels against deciding complicated legal issues

and the Court may not approve Bruno's request to reject the current CBAs.

## A. Element Number Eight

Element number eight is, "The Union <u>must have</u> refused to accept the proposal <u>without good cause</u>." <u>In re American Provision Co.</u>, 44 B.R. 907, 909 (Bankr. D. Minn. 1984) (emphasis added).[27]  The immediate question is: What is "good cause?"

## B. Good Cause

One of the most often cited opinions defining "good cause" is <u>New York Typographical Union No. 6 v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.)</u>, 981 F.2d 85 (2nd Cir.1992).  Writing for the Court of Appeals for the Second Circuit Judge Richard J. Cardamone explained:

> What "good cause" means is difficult to answer in the abstract apart from the moorings of a given case. A more constructive and perhaps more answerable inquiry is why this term is in the statute. We think good cause serves as an incentive to the debtor trying to have its labor contract modified to propose in good faith only those changes necessary to its successful reorganization, while protecting it from the union's refusal to accept the changes without a good reason.

> To that end, the entire thrust of § 1113 is to ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process. Reorganization procedures are designed to encourage such a negotiated voluntary modification. See Joseph L. Cosetti &

---

where a clear, principled, alternative basis for reaching the same result exists." <u>TI Federal Credit Union v. DelBonis</u>, 72 F.3d 921, 927 (1st Cir. 1995).  The result would be the same even if Bruno's satisfied all other eight elements.  Failing to prove one is the same as failing to prove all nine.  In either event, the Court cannot grant its motion.  In contrast, if there is an appeal of this Court's decision and the decision is reversed and remanded, the Court will address the other eight elements if necessary.

[27] Element eight is, in an important way, different from some of the other elements. While most reported cases interpreting these elements agree that while a debtor seeking to reject a CBA has the burden of proving all of the nine elements, some believe that burden may shift to the union under element eight to prove that it had "good cause" to refuse the debtor's proposal.  The court in <u>In re Bowen Enterprises, Inc.</u>, 196 B.R. 734, (Bankr. W.D. Pa. 1996) explains, "Debtor bears the ultimate burden of persuasion, by a preponderance of the evidence, as to all of these requirements. This does not, however, mean that the burden of production is upon debtor in every instance. The burden of production lies upon the union as to requirements (5), (7), and (8). See <u>In re Express Freight Lines, Inc.</u>, 119 B.R. 1006 (Bankr. E.D. Wis.1990); <u>In re Garofalo's Finer Foods</u>, 117 B.R. 363, 370 (Bankr. N.D. Ill.1990)." <u>Id</u>. at 741.

24

Stanley A. Kirshenbaum, Rejecting Collective Bargaining Agreements Under Section 1113 of the Bankruptcy Code-Judicial Precision or Economic Reality?, 26 Duq.L.Rev. 181, 221 (1987). Knowing that it cannot turn down an employer's proposal without good cause gives the union an incentive to compromise on modifications of the collective bargaining agreement, so as to prevent its complete rejection. Because the employer has the burden of proving its proposals are necessary, the union is protected from an employer whose proposals may be offered in bad faith. See Jeffrey W. Berkman, Note, Nobody Likes Rejection Unless You're a Debtor in Chapter 11: Rejection of Collective Bargaining Agreements Under 11 U.S.C. § 1113, 34 N.Y.L.Sch.L.Rev. 169, 187-88 (1989).

Thus, for example, a union will not have good cause to reject an employer's proposal that contains only those modifications essential for the debtor's reorganization, that is, the union's refusal to accept it will be held to be without good cause. On the other hand, as we have noted, where the union makes compromise proposals during the negotiating process that meet its needs while preserving the debtor's savings, its rejection of the debtor's proposal would be with good cause. See Royal Composing Room, 848 F.2d at 349.

Id. at 90.[28]

In re Northwest Airlines Corp., 346 B.R. 307 (Bankr. S.D.N.Y. Jun 29, 2006) includes a good general definition of "good cause" and explains the relationship of the "good cause" concept to section 1113. It reads:

After the requirements of § 1113(b) are met, § 1113(c)(2) conditions the rejection of a collective bargaining agreement on a union's refusal to accept a debtor's proposal "without good cause." Although "good cause" is not defined in the Bankruptcy Code, it is closely related to the requirements of § 1113(b)(1) described above, as well as the requirement under § 1113(b)(2) that the parties negotiate in good faith.

In terms of § 1113, the burden on the parties to negotiate is best analyzed under § 1113(c)(2), which permits rejection of the agreement only if the union has rejected the debtor's proposal without good cause. If the union seeks to negotiate compromises that meet its needs while

---

[28] The Maxwell Newspapers case is similar to Bruno's. One of the issues there was the, "appropriateness of the Court's approval of rejection of a collective bargaining agreement where the sole purpose of the rejection is to enhance the market value of the debtor's assets." In re Manor Oak Skilled Nursing Facilities, Inc., 201 B.R. 348, 350 (Bankr. W.D.N.Y. Aug 22, 1996).

preserving the debtor's required savings, it would be unlikely that its rejection of the proposal could be found to be lacking good cause. <u>If, on the other hand, the union refuses to compromise</u>, it is as unlikely it could be found to have acted with good cause. <u>Royal Composing Room</u>, 848 F.2d at 349; see also <u>Horsehead Indus.</u>, 300 B.R. at 585.

<u>Id</u>. 327 (emphasis added).

The court added:

Once a debtor establishes that its proposal is necessary, fair and in good faith, the union must produce sufficient evidence to justify its refusal to accept the debtor's proposal. See <u>Carey Transp.</u>, 816 F.2d at 92; <u>Mile Hi Metal Sys.</u>, 899 F.2d at 892 n. 6. If a union demands provisions that are not economically feasible and offers no alternatives that would permit the debtor to reorganize, the court will find that the union acted without good cause. <u>In re Maxwell Newspapers, Inc.</u>, 981 F.2d 85 (2d Cir.1992).

<u>Id</u>. at 328.

A very recent decision confirms that these standards are still applied. The opinion in <u>In re Frontier Airlines Holdings, Inc.</u>, Case No. 08-11298(RDD), 2008 WL 511092 (S.D.N.Y. Nov 14, 2008) includes:

Thus, where the union rejects a proposal that is necessary, fair and equitable, if it fails to adequately explain and justify the reasons for its opposition, the debtor has passed the Section 1113(c)(2) hurdle. On the other hand, if the union makes counterproposals that meet its needs while preserving the savings required by the debtor, its rejection of the debtor's proposal will be with good cause under Section 1113(c)(2), and the debtor's proposed rejection of the agreement will not be approved by the court. Again, see <u>In re Horsehead Industries</u>, 300 B.R. at 584, quoting and citing, among other cases, <u>In re Maxwell Newspapers, Inc.</u>, 981 F.2d 85, 90 (2d Cir.1992), and <u>Carey Transportation</u>, 816 F.2d at 92.

<u>Id</u>. at *14.[29]

---

[29] The opinion in <u>In re Horsehead Industries</u>, 300 B.R. 573 (Bankr.S.D.N.Y.2003) cited above includes:

The "good cause" requirement in subparagraph (1) fosters the goals of good faith negotiations and voluntary modifications. It induces the debtor to propose only those modifications necessary to a successful reorganization while protecting the debtor against

26

And finally, defining what "good cause" is not, is as helpful as defining what it is. The court in In re Alabama Symphony Ass'n, 155 B.R. 556, 577 (Bankr. N.D. Ala. 1993), aff'd in part, rev'd in part on other grounds, 211 B.R. 65 (N.D. Ala. 1996), explains, "'Without good cause' is not synonymous with 'in bad faith.' In re Salt Creek Freightways, 47 B.R. 835 (Bankr.D.Wyo.1985). Instead, 'without good cause' must be reviewed by an objective standard that accounts for the purposes of Chapter 11. Id. In essence, this means that the union must indicate a willingness to work with the debtor in its attempts to reorganize." Id. at 577 (footnote omitted) (emphasis added).

### C. Application of the "Good Cause" Standards

Applying these legal standards to the evidence, the Court finds that the Union had "good cause" to reject Bruno's proposal that the successorship clauses should be removed from the four current CBAs.

After the parties exchanged and discussed different proposals, their final positions were these. Bruno's position was that the successorship clauses should be eliminated. The Union's position was that the successorship clauses should remain. The parties were completely at odds. They were at an impasse. To break this deadlock the Union modified its proposal. It made a counterproposal that a buyer would not be required to assume the current CBAs with the successorship clauses, if the buyer agreed to negotiate with the Union to reach a new agreement with a successorship clause.

The Union's counterproposal of course begs the question: Is there really any difference between the Union's original position and its modified position? That determination is very important in the context of element eight's "good cause" standard, which is, "The Union must have refused to accept the proposal without good cause." In re American Provision Co., 44 B.R. 907, 909 (Bankr. D.Minn.1984).

Clearly successorship clauses are very important to potential purchasers. Mr. Grady and Mr. Smith both testified that no potential buyer had approached Bruno's

_____

the union's refusal to accept its proposal without a good reason. In re Maxwell Newspapers, Inc., 981 F.2d 85, 90 (2d Cir.1992). Where the union rejects a proposal that is necessary, fair and equitable, it must explain the reasons for its opposition. Mile Hi Metal Sys., Inc., 899 F.2d at 892; Carey Transp. Inc., 816 F.2d at 92. On the other hand, if the union makes counter-proposals that meet its needs while preserving the savings required by the debtor, its rejection of the debtor's proposal will be with "good cause." See Maxwell Newspapers, Inc., 981 F.2d at 90; Royal Composing Room, Inc., 848 F.2d at 349.

Id. at. 585.

27

and offered to purchase the stores as an ongoing business and at the same time agreed to assume the four current CBAs.  Mr. Vincent agreed.

To support its position, Bruno's argued that the successorship clauses will, "absolutely prevent a sale, lead to liquidation, and ultimately result in nearly 4000 lost jobs."  Debtor's Motion to Reject Collective Bargaining Agreements Pursuant to Section 1113 at 17, Document No. 365.  Bruno's added that the evidence is, "uncontroverted" that potential purchasers, "will not purchase with the CBAs in place." Id. at 18.  Bruno's continued, "Removal of the successorship clause is not only necessary, but critical, to facilitate the sales process."  Id. at 27 (footnote omitted). Bruno's concluded, "If the Motion is denied, liquidation will occur soon after. All Bruno's employees will lose their jobs. The unsecured creditors' recovery will be reduced. The lessors will lose their tenants." Bruno's Post-Hearing Brief at 1, Docket No. 610.[30]

What if Bruno's is correct?  How do you respond if you are the Union?  If the issue is so clear, is there any room for compromise?  Mr. Smith thinks so.  After testifying that he believed that there would be bidders even if the current CBAs were in place, he explained:

> We have bidders who have indicated for a small number of stores that they would be willing to negotiate with the Union.  We have not had bidders who have indicated that they would be willing to assume the collective bargaining agreement.  To the extent that it's in place, it will impact, may impact in totality the number of bidders who show up.  Um, but, that's not to suggest that none of those bidders is willing to negotiate and willing to participate in the development of a collective bargaining agreement per se.

R. 11:36.  Unofficial Transcript.

Documentary evidence and testimony supports these conclusions.  Both Mr. Grady and Mr. Smith discussed the "offers" Bruno's had received.  The documentary evidence from those "offers" confirms that there is room for compromise.

The "offer" represented by Debtor's Exhibit 19 included the provision that, "it shall be a condition precedent to the acquisition of the Sale Assets relating to such Store that Buyer (and/or its Retail Operator) enter into a new collective bargaining agreement with the UFCW or other arrangement on acceptable terms....".  Id. (emphasis added).

---

[30] Bruno's also argued that it will not receive the best value at a sale if the successorship clauses are in place, even if there is a sale with the clauses in place.  Whether that argument is in reference to a liquidation sale or a sale of stores as an ongoing business, it does not relate to whether the Union had "good cause" to refuse Bruno's proposal.

The "offer" represented by Debtor's Exhibit 20 was modified to include, "I want to alert you that <u>we may be willing to accept a renegotiated union contract</u> if that makes our offer more attractive. We would be willing to meet with the Union to explore this possibility. Please keep this in mind as you consider our bid." Union Ex. 12 at 1 (emphasis added).

Consequently, of the two offers Bruno's had at the time, <u>both</u> were willing to accept the now Union position that neither would be required to assume the current CBAs, but that they would negotiate with the Union later to reach a CBA. That is precisely the Union's current position and the proposal the Union offered to Bruno's when the Union refused Bruno's proposal. Therefore, while the Union's counterproposal may not be the total solution to these parties' problems, it <u>cannot be said</u> that the Union refused Bruno's proposal "without good cause," even where the Union insists that any new contract include a successorship clause. That is the evidence. As such, that evidence supports the conclusion that the Union's counterproposal was legitimate and was something that at least two potential buyers considered.

In addition, the evidence confirms that there is a real difference between assuming a current CBA with a successorship clause and renegotiating a new CBA with a new successorship clause. Mr. Glanzer, the Union's expert, testified that there are degrees of successorship clauses. The current ones are "middle-of-the-road." <u>Id</u>. That testimony demonstrates that there are differences that leave the door open for a new CBA with a <u>different</u> successorship clause. Maybe the Union thinks it can renegotiate a new CBA with a more stringent successorship clause. Maybe a buyer thinks it can renegotiate a new CBA with a less stringent successorship clause. There are clearly many possibilities.

In either event, section 1113's purpose is to require the parties to negotiate. This Court's duty is to review those negotiations. The specific part of those negotiations under review here is the Union's refusal of Bruno's proposal that the successorship clauses be eliminated. The issue is whether that refusal was made "without good cause." For the reasons stated above, the Court finds that it was not.

In summary, the Union made a counterproposal that was a positive step in resolving this very difficult situation for Bruno's, its employees, its creditors, and its landlords. That proposal could have kindled further discussions. The fact that it did not, does not mean that it was made "without good cause." Similarly, the fact that Bruno's did not accept the counterproposal does not mean that Bruno's acted in bad faith. The parties simply disagreed. When the Union attempted to compromise, it did what the law required it to do. That is what this Court has considered in determining the Union's "good cause," not which proposal or counterproposal is better.

Therefore, the answer to the question the Court asked above is yes. There is a real difference between the Union's original proposal and its counterproposal. That

counterproposal met the legal standards described above.[31]  Based on those conclusions, the Court finds that the Union acted with good cause when it refused Bruno's proposal to eliminate the successorship clauses from the four current collective bargaining agreements.[32]

## VII.  Conclusion

The issue is not whether Bruno's position is right and the Union's is wrong, or vice versa. The issue is not whether collective bargaining agreements are good or bad. The issue is whether Bruno's proved, by a preponderance of the evidence, that the Union refused Bruno's proposal "without good cause."[33]  The Court finds that it did not. In contrast, the Court finds that the Union met the legal standards discussed above and did prove, by a preponderance of the evidence, that it refused Bruno's proposal with good cause.  A separate order will be entered in conformity with this Memorandum Opinion.

Dated:  April 27, 2009           /s/Benjamin Cohen_____
                                      BENJAMIN COHEN
                                      United States Bankruptcy Judge

BC:pb

---

[31] See New York Typographical Union No. 6 v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.), 981 F.2d 85 (2nd Cir.1992); In re Northwest Airlines Corp., 346 B.R. 307 (Bankr. S.D.N.Y. Jun 29, 2006); In re Frontier Airlines Holdings, Inc., Case No. 08-11298(RDD), 2008 WL 5110927 (S.D.N.Y. Nov 14, 2008); and In re Alabama Symphony Ass'n, 155 B.R. 556, 577 (Bankr. N.D. Ala. 1993), aff'd in part, rev'd in part on other grounds, 211 B.R. 65 (N.D. Ala. 1996).

[32] If the burden of proof shifted to the Union, as the court in In re Northwest Airlines Corp., 346 B.R. at 328 suggests that it might, the Court finds that the Union met that burden. The Court has not, however, addressed the independent issue of whether the burden shifted because Bruno's established, "that its proposal is necessary, fair and in good faith...." Id.

[33] Right or wrong, section 1113 is weighted in favor of maintaining collective bargaining agreements.  Its standards are strict.  The fact that Bruno's did not meet them is not a negative reflection on its management or its attorneys in any way.  Both parties represented their positions and their constituents in the most professional and responsible manners possible. The Court appreciates their assistance.

30